ABEL CANTERBURY ET AL. v. STATE OF MISSISSIPPI.

[43 South., 678.]

1. CRIMINAL LAW AND PROCEDURE. *Assault with intent to murder. Deadly weapon. Indictment.*

An indictment for an assault and battery with intent to kill and murder, charging that the offense was committed with a deadly weapon, is not defective for failure to specify the particular weapon used.

2. SAME. *Altercation ended. New one.*

Defendants who, after an altercation has ended, follow a departing adversary and fall upon him, when they are in no danger real or apparent from him, and stab him with knives until restrained by others are guilty of assault and battery with intent to kill and murder.

3. SAME. *Instructions.*

An instruction is erroneous and should be refused if there be no evidence of which to predicate it.

4. SAME. *Request for instruction. Court not to give without. Code 1906, § 793.*

In a prosecution for an assault and battery with intent to kill and murder the court is without authority under Code 1906, § 793, so providing, to give an instruction to the effect that the jury might find defendants guilty of a lesser constituent offense, in the absence of a request in writing to do so.

5. SAME. *Harmless error.*

It was not prejudicial error, where the evidence overwhelmingly showed a battery as well as an assault with intent to kill and murder, to instruct that the jury might convict of an assault and battery with intent to kill and murder, upon belief from the evidence that defendants were guilty of an assault with such intent.

FROM the circuit court of Smith county.

HON. ROBERT L. BULLARD, Judge.

The appellants, Bud and Abel Canterbury, brothers, were, together with their father, John Canterbury, jointly indicted

for an assault and battery upon one Samuel Harrison with intent to kill and murder him. At the instance of the district attorney, who desired to secure the testimony of the father, John Canterbury, the court below caused a verdict of not guilty as to John, the father, to be placed upon the minutes of the court. The two brothers, Bud and Abel, were tried jointly; the indictment charging that they did "wilfully, feloniously and of malice aforethought make an assault on one Sam Harrison, with deadly weapons, to-wit, pocketknives, and him, the said Sam Harrison, they, the defendants, with said deadly weapons then and there wilfully, feloniously and of malice aforethought did strike, cut and wound in the attempt and with the intent, him, the said Sam Harrison, with said deadly weapons, wilfully, feloniously and of malice aforethought to kill and murder, against the peace and dignity," etc.

The jury returned a verdict of guilty, as charged in the indictment, and the defendants were sentenced to the penitentiary, Bud for five years, and Abel for seven years.

The facts in regard to the killing, and the points upon which reversal was asked, are fully stated in the opinion of the court.

*A. J. McLaurin,* for appellants.

The first instruction granted for the state was erroneous. It was as follows:

"The court instructs the jury for the state that even though they should believe from the testimony that Sam Harrison was the aggressor, yet if they further believe from the evidence beyond a reasonable doubt that Harrison abandoned the difficulty and began a flight and if they further believe from the evidence beyond a reasonable doubt that Harrison was pursued by Abel Canterbury and Bud Canterbury and attacked by them with deadly weapons with intent to kill and murder said Harrison at a time when they, defendants, were in no immediate danger, real or apparent, of loss of life or

great bodily harm, they should find the defendants guilty as charged in the indictment." It is erroneous in several particulars.

1. It does not *define murder,* and, therefore, did not inform the jury what was meant by an intent to murder. *Kearney* v. *State,* 68 Miss., 239, s.c., 8 South., 292; *Hunter* v. *State,* 74 Miss., 519, s.c., 21 South., 305; *Jackson* v. *State,* 79 Miss., 45, s.c., 30 South., 30; *Wood* v. *State,* 81 Miss., 165, s.c., 33 South., 285; *Lofton* v. *State,* 79 Miss., 723, s.c., 31 South., 420; *Harper* v. *State,* 83 Miss., 413, s.c., 35 South., 572. It seems a travesty to tell the jury to convict if the defendants intended to kill and murder, without informing the jury of any of the elements of murder—that it was necessary to be done of malice aforethought, or deliberation, or premeditation. As well instruct the jury to convict if the defendants are guilty.

2. The charge in the indictment is of a joint offense and there is no evidence of conspiracy or concerted action on the part of defendants; and an instruction should not be given without evidence to which it could apply. *Ball* v. *State,* 67 Miss., 362, s.c., 7 South., 353; *Brabston* v. *State,* 68 Miss., 208, s.c., 8 South., 326; *Hogan* v. *State,* 46 Miss., 274; *Association* v. *McConnico,* 53 Miss., 233; *Kinnare* v. *Gregory,* 55 Miss., 612; *Wheaton* v. *Sexton,* 17 U. S. (4 Wheaton), 508.

3. The instruction denies defendants the right to have the jury consider whether the act would have been murder or manslaughter, had Harrison been killed. *Eaverson* v. *State,* 73 Miss., 810, s.c., 19 South., 715; Wharton on Homicide, sec. 5.

4. The instruction told the jury that a conviction was required if the assault and battery with intent to kill and murder was made with any kind of deadly weapons; whereas, the indictment charged that it was made with pocketknives. *Lanier* v. *State,* 57 Miss., 102; *Porter* v. *State,* 57 Miss., 300; *Dick* v. *State,* 30 Miss., 630; *Commonwealth* v. *McGowan,* 1 Metcalf (Ky.), 368; *Kinnard* v. *State,* 35 Texas Crim.

Rep., 276; *State* v. *McDonald,* 10 Mon., 21, 24 American St. Rep., 25; *Lunsford* v. *State,* 1 Tex. Ct. App., 448; *Brisco* v. *State,* 4 Tex. Ct. App., 219; *Jordt* v. *State,* 31 Tex., 571; *Lynch* v. *State,* 89 Ala., 18. These authorities demonstrate that the allegation must be supported by the evidence, even where the allegation is a matter of description that need not have been inserted. 1 Greenleaf (15th ed.), secs. 65, 68; *Gray* v. *State,* 11 Tex. Ct. App., 411; *Com.* v. *King,* 9 Cushing (Mass.), 284; *Berrien* v. *State,* 83 Ga., 381.

On the first one of these points I do not deem it necessary to comment further than to make reference to the authorities to which I have referred.

If the court undertakes to instruct the jury at all it ought to instruct it as to some principle of law that does not appear upon the face of the pleading. For instance, on an indictment for murder it would seem idle to instruct the jury to find the defendant guilty of murder if they believe from the evidence that he is guilty of murder, without defining murder. So if the jury is instructed to find the defendant guilty of assault and battery with intent to kill and murder, if the jury believe he intended to kill and murder gives no guide to the jury, as to what constitutes murder. It does not tell them that murder has as its basic element malice aforethought, deliberation, or premeditation.

This is a joint offense, and the two defendants ought not to be convicted of two *several* offenses although they are exactly of the kind charged to have been committed by them jointly. The rights of defendants ought to be scrupulously protected. In this particular case the statute provides that they cannot have a severance unless they ask for it before either is arraigned and pleads. Two men may be arrested and brought into court and immediately arraigned and may plead not guilty before they have an opportunity to get a lawyer, not knowing the necessity of a lawyer from the beginning, and then they are denied the right to a severance. Parenthetically, allow me to

illustrate by this very case, although the illustration does not appear in the record, but I am reliably informed that these defendants were arrested and arraigned and pleaded not guilty before they had an opportunity to employ counsel, and then when their counsel asked for a severance were denied the severance because the application came too late. It is important, therefore, that defendants be protected to the extent that crimes by them severally shall not be permitted to be charged against them jointly and then they be denied a severance. *Ball* v. *State,* 67 Miss., 362, s.c., 7 South., 353; *Elliot* v. *State,* 26 Ala., 78, which in *Ball* v. *State* is said to be the correct doctrine. I contend that the offenses, if offenses at all, committed by Bud and Abel Canterbury were separate offenses,—not joint. There is not the least pretense in the evidence that there was any conspiracy or concerted action between these two defendants. They were not in sight of each other when the difficulty commenced. Preaching was over for the morning and Abel was at the table, where dinner was being served; Bud was on a different part of the ground, at the church house door. After the difficulty commenced and after Harrison had stabbed both Abel and old man Canterbury, and manifestly supposing old man Canterbury killed, had run, Bud Canterbury heard someone exclaim that his father was killed, and started to his father, and saw him bleeding, with an awful gash cut in his throat, and as one of the witnesses for the state described it, "with the whole side of his head cut off," and as another witness for the state described it, "his under jaw was cut through from the back of his ear and into his mouth," and Harrison, running, met Bud, cut at him with his knife and cut his collar, and from that he and Bud engaged in a running fight, into which Abel afterwards fell. Abel testified that he did not cut Harrison at all. But granting that Abel cut him, as well as Bud, each was cutting on his own responsibility and neither was responsible for the act of the other, and had he been killed by one, the other would not have been responsible for the homicide. For this

I refer to the case of *Brabston* v. *State,* 68 Miss., 208, s.c., 8 South., 326. On p. 219 of that case as reported the court says: "We recognize that if two or more agree to kill another person or do him great bodily harm, and designedly and knowingly co-operate in an effort to accomplish that common purpose, and, in executing that purpose, one of them kill him, all are principals in the homicide, and equally liable in law for it; but *we do not hold* the doctrine that if two men fight in a crowd, with or without deadly weapons, and some outsider, without concert with or knowledge of either of the two combatants, fire at and kill one of them, as his prejudice or prepossession may prompt, the survivor is responsible in law for the homicide." So this doctrine of their joint responsibility is repudiated by the supreme court in the quotation which I have just made. Both Abel and Bud Canterbury testified that they did not see each other during the conflict. Therefore, if there were any offenses committed at all by these two defendants, or either of them, it was several, and not a joint offense. "In homicide,—if without concert, one inflicts an injury on a man one day, and another injures him on a different day, and he dies, the two cannot be indicted jointly; because, in law, under these facts they are not jointly guilty. 1 Bishop, New Criminal Procedure, sec. 470, par. 2; *Regina* v. *Devett,* 8 Car. & P., 639; Archb. Pl. & Ev., 13, London edition 54." Now, if the injuries named in this were a day apart or an hour apart or a minute apart or a second apart, for that matter, it is immaterial. The material thing is that they are *separate* and *independent* injuries, inflicted by different persons. The authority for the proposition that the length of time the offenses were apart is immaterial is found in the case of *Jones* v. *State,* 66 Miss., 380, s.c., 6 South., 231. In that case it was held by the supreme court of this state that Jones could be guilty of an offense in cutting Lloyd and of another separate offense in cutting Thomas, although they were both cut in the same difficulty and practically at the same time. The court also held in that

case that he could be innocent in cutting Lloyd and guilty in cutting Thomas, although it was in the same fight. This demonstrates as conclusively as a proposition in geometry that the length of time between the two offenses, whether a day or an hour or a minute or a second, is not material, and makes the authority I referred to in First Bishop's New Criminal Procedure, sec. 470, par. 2, as applicable where the two injuries are inflicted by two different persons in different seconds as on different days.

Again the instruction is erroneous because it denies defendants the right to have the jury consider whether the act would have been murder or manslaughter, had Harrison been killed. Wharton on Homicide, sec. 5; *Eaverson* v. *State,* 73 Miss., 810, s.c., 19 South., 715. The instruction is predicated upon the admission that Harrison was the aggressor. The evidence shows that he was the aggressor, with a knife, and that he cut Abel Canterbury on the arm with it over the shoulder of his father, and nearly killed old man John Canterbury. Harrison himself testifies that he had a knife that he had picked up to eat dinner with. In the very nature of the case he was bound to have had that knife, when he first struck Abel Canterbury. On cross-examination this question was propounded to Harrison: "Isn't it a fact, that you was standing at the table with a knife in your hand?" His answer was, "Not at the table"; evidently intending to admit that he had a knife in his hand. Then the next question, "At Mr. Luckey's wagon; weren't you standing back at Mr. Luckey's table with a knife in your hand?" to which he answered, "I don't know, I had it open, got the knife open." Now remembering that he hit Abel but one lick and remembering that instantly after old man Canterbury was stabbed in the side, and his head nearly cut off, Harrison must have had his knife open before the difficulty commenced. Nobody claims to have seen Abel with a knife before he was cut, or before his father was cut, or before Harrison ran, and a number of witnesses testified that Abel ran away and hol-

lowed for a knife after Harrison had cut him in the arm.
This question was asked Harrison: "Isn't it a fact that when
you struck him Abel ran and asked someone to give him a
knife?" to which Harrison answered, "I don't remember
whether I cut Abel or not." The next question then is, "Did
you cut at Abel?" and his answer is, "I don't know. I
couldn't state. I had a little old knife, and I did the best I
could with it to save my life." Now, as he struck Abel but
once, and does not know whether he cut him or not, and says
he did the best with the knife he could, this also proves that he
cut Abel before Abel ever did anything to him except to pull
off his coat and offer to fight him. Harrison, in speaking about
old man Canterbury, said, "I cut him, never had my hands
on him." When he was asked, "Isn't it a fact that all of this
part of the jaw fell down and you stabbed him in the back?"
(having reference to the father, John Canterbury), Harrison
answered, "I don't know whether I did or not." Thus far I
have adverted only to the testimony of the prosecutor and the
prosecution witnesses. Now note the testimony of Dukes, a
witness for defendants, who testified· that when he saw the
trouble brewing, the father, John Canterbury, had hold of
his son Abel, shoving him back, and witness never saw Harri-
son until the old man had about settled Abel, when Harrison
came around from back of the wagon and ran up and cut Abel
over his father's shoulder, and as he did so the father, who had
about quieted his son Abel, turned to shove Harrison back, who
had become the aggressor,—not for the purpose of doing Har-
rison any violence, but to prevent Harrison's further violence
upon Canterbury's son, and Harrison thereupon stabbed this
old man, catching him by the whiskers and cut his head nearly
off, and then ran. This testimony of Duke's is supported by
the testimony of a number of other witnesses, both for the
state and for the defendants. "Where, upon sudden quarrel,
two persons fight, and one of them kills the other, this is vol-
untary manslaughter, and so if they, upon such occasion, go

out and fight in a field; for this is one continued act of passion. So also if a man be greatly provoked by any gross indignity, and immediately kills his aggressor, it is voluntary manslaughter, and not excusable homicide, not being *se defendendo*. In these and such like cases, the law, kindly appreciating the infirmities of human nature, extenuates the offense committed, and mercifully hesitates to put on the same footing of guilt, the cool, deliberate act and the result of hasty passion." 1 Wharton on Homicide, sec. 5, also *Brabston* v. *State,* 68 Miss., s.c., 8 South., 326, and *Eaverson* v. *State,* 73 Miss., s.c., 19 South 715; *Morman* v. *State,* 24 Miss., 55; *Gipson* v. *State,* 38 Miss., 310; *Bedell* v. *State,* 50 Miss.; and I contend that this instruction erroneously denied to the jury the right to decide whether it would have been murder had either of the Canterburys killed Harrison.

The first instruction is erroneous in that it authorizes the jury to convict if the assault was made with any kind of deadly weapons, whereas, the indictment charges an assault and battery with *pocketknives*. There is no evidence as to the kind of knives used, or as to the kind of knives that either of the defendants had, except the testimony of one witness that Bud had a knife that looked like a drawing knife. A drawing knife is defined by Webster to be, "A joiner's tool, having a blade, with a handle at each end, used to shave off surfaces by drawing it to one, a shave, also called draw-shave, and drawing-shave. A tool used for the purpose of making incisions along the path a saw has to follow, to prevent it from tearing the surface of the wood." A pocketknife is defined by Webster to be "a knife of one or more blades, which fold into the handle, so as to admit of being carried in the pocket." If there was evidence from which it might be inferred by the jury that the knives used by Abel and Bud were pocketknives the instruction does not call upon the jury to decide that question, but tells the jury that if any deadly weapons were used it is sufficient. In the case of *Lanier* v. *State,* 57

Miss., 102, the syllabus says as follows: "Under an indict-
ment for assault with a pistol the accused cannot be convicted
of an assault with another weapon." This is borne out by the
text of the decision, where, on page 105, this language was
used by Chief Justice GEORGE, to-wit: "It is true that un-
der the indictment the jury were authorized to convict of an
assault with a pistol *only."* It was necessary to mention that
the assault and battery was committed with a deadly weapon.
Code 1892, § 967. Then this language is used by Greenleaf,
sec. 65, p. 103, of the 15th edition: "But where a person or
thing, necessary to be mentioned in an indictment, is described
with unnecessary particularity, all the circumstances of the de-
scription must be proved; for they are all made essential to the
identity." See also sections 56, 57 and 58. In section 58
this language is used, to-wit: "In the first place, it may be
observed that any allegation which narrows and limits that
which is essential is necessarily descriptive." Now if this
description is unnecessarily particular it must, nevertheless,
be proven. *State* v. *Newland,* 7 Iowa, 242; 71 American
Decisions, 444. In that case the syllabus, which is borne out
by the text, uses this language, to-wit: "Where a person or
thing necessary to be mentioned in an indictment is described
with unnecessary particularity, all the circumstances of the
description must be proved." See also *Gray* v. *State,* 11 Tex.
App., 411. These are sufficient authorities to sustain the
proposition that I make, that the restriction of the weapon to
a pocketknife is not such surplusage as can be rejected. It
probably would have been sufficient to describe the deadly
weapon as a knife—I am not prepared, however, to say that
it would be sufficient—but when it is described as a pocket-
knife, then whether this is unnecessary particularity or not
it must, according to the authorities I have named, be proven
to have been a pocketknife. Otherwise, there is a variance
between the allegations and the proof. 1 Greenleaf, secs. 56,
57, 58, 65; *Gray* v. *State,* 11 Tex. Ct. App., 411; *Berrien* v.

*State,* 83 Ga., 381; *Com.* v. *King,* 9 Cushing (Mass.), 284; *Stratton* v. *State,* 13 Ark., 688; *Lanier* v. *State,* 57 Miss., 102; *Dick* v. *State,* 30 Miss., 300.   But this instruction tells the jury that it is not necessary to prove the weapons to have been pocketknives, but that if they were any kind of deadly weapons it was sufficient to sustain the indictment.   It seems to me clear that this is such a glaring error as to call for a reversal of the case.   With this error committed in the instruction the defendants did not have the benefit of a correct enunciation of the law to the jury and having been convicted upon erroneous enunciation of the law were subjected to severe penalties, and have been undergoing imprisonment in the jail since the trial.

There is another serious error in this first instruction.   The indictment is for assault and battery with intent to kill and murder, yet this instruction says that if the defendants attacked Harrison with deadly weapons they should be found guilty as charged, which means assault and battery with intent to kill and murder.   Now, they may not, according to that instruction, have been guilty of doing more than assaulting him, because "attack" means to assault—3d Cyc., p. 1033; *Wilson* v. *State,* 53 Ga., 205—yet they are told that upon committing an *assault* with deadly weapons with intent to kill and murder they are to be found guilty of assault and *battery* with intent to kill and murder.   *Bryant* v. *State,* 41 Ark., 359; *Young* v. *People,* 6 Ill. App., 434.

The second instruction for the state is probably not erroneous in so many particulars as the first one; but it has one error in it that is utterly fatal.   The instruction reads as follows:   "The court charges the jury for the state that if from the evidence they believe beyond a reasonable doubt that defendants, Abel Canterbury and Bud Canterbury, made an assault on Sam Harrison with deadly weapons, or if they made an assault and cut and wounded the said Harrison with deadly weapons, to-wit: pocketknives, with intent to kill and murder him, the said Sam Harrison, as charged in the indictment, at

a time when they, the defendants, were in no immediate danger, real or apparent, of loss of life or great bodily harm, then the jury should return a verdict of guilty as charged in the indictment." This instruction charges the jury in the alternative. The first alternative is that if the defendants made an assault on Sam Harrison with deadly weapons they are to convict. The second is that if they made an assault and cut and wounded Harrison with pocketknives with intent to kill and murder him they are to convict. Surely the assault on Harrison with deadly weapons would not justify a verdict of guilty of assault and battery with intent to kill and murder. If it be said that the instruction meant something other than it said, then it was erroneous because it was not explicit enough to be understood and was, therefore, confusing. An instruction should be instructive as to the law, and not confusing.

It was error to modify the twelfth instruction asked by the defendants by striking out the words, "and to pursue Sam Harrison." 1 East P. C., 271; *State* v. *Thompson,* 9 Iowa, 188, 192; 1 Bishop on Criminal Law (7th ed.), sec. 853. In this section of Bishop this language is used: "A man may repel force by force in defense of his person, habitation, or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony; such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases, he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and, if he kill him in so doing, it is called justifiable self-defense." Bud Canterbury testified that after Harrison struck at him with his knife, he struck back, and that Harrison then ran his hand in his bosom as if about to draw a pistol, and then he followed him with his knife. The state, it will be noticed, when Bud Canterbury started to tell what he thought if he didn't jump right on Harrison, objected, and seems to have interrupted the connection of his testimony; but there is enough of it to show that he thought he was in danger from a pistol if

he didn't pursue the advantage he had.   Several other witnesses (some of them state's witnesses) testified that they feared Harrison would shoot and that they got out of line for that reason.   So the part of the instruction that was stricken out was applicable to the case, and ought to have remained in the instruction.

*J. J. Stubbs,* on the same side.

The first instruction for the state was fatally defective, for as granted it excluded any consideration of heat or passion.

The second instruction for the state was also fatally defective, for it directed conviction of *assault and battery* with intent to murder, although the defendants were guilty only of an assault with deadly weapons.   The word, assault, does not include in its meaning the word, battery.   Code 1906, § 1043. The indictment merely says that the defendants "did unlawfully, wilfully, feloniously and of malice aforethought *make an assault* on one Sam Harrison, with deadly weapons, to-wit, pocketknives."   The instruction extended its sway beyond the limits of the charge in the indictment.

The court erred in modifying the twelfth instruction asked by appellants.   The modification consisted in the striking out of the instruction the words, "and to pursue Sam Harrison." By reason of the modification of this instruction, it was not read to the jury.   It was error to so modify it.   *Fortinberry* v. *State,* 55 Miss., 403.

The verdict of the jury was not supported by the law nor by the evidence.   And a new trial should have been granted the appellants.   If the wounds inflicted on Harrison had resulted in his death, appellants, at most, would have been guilty only of manslaughter.   *Cotton* v. *State,* 31 Miss., 504; *Beasley* v. *State,* 64 Miss., 518, s.c., 8 South., 234; *McLaurin* v. *State,* 64 Miss., 529, s.c., 1 South., 747; *Kelly* v. *State,* 68 Miss., 343, s.c., 8 South., 745; *Jackson* v. *State,* 79 Miss., 42; *Rowland* v. *State,* 83 Miss., 483, s.c., 35 South., 826.   The jury were

not warranted in bringing in the verdict which they did against the appellants, hence the judgment should be reversed.

*R. V. Fletcher,* attorney-general, for appellee.

It is earnestly contended by the learned counsel for the appellants that the first instruction granted to the state was faulty in that it authorized the jury to find the appellants guilty under certain conditions, if the jury believed that the attack was made with deadly weapons, without specifying that the deadly weapons were pocketknives. This contention is founded on the fact that the indictment charges that appellants made the assault upon Harrison with pocketknives. Opposing counsel insist that since the district attorney saw proper to designate specifically the kind of knives used, such allegations in the indictment become a material and descriptive part of the offense, and must be supported by the proof, and be specifically referred to in the charges to the jury.

There are two answers which may be made to this contention. In the first place, it is not at all necessary to describe the kind of weapons which were used, and the designation, "pocket," in reference to the knives, may be dismissed as surplusage. In the second place, it is submitted that a fair and practical view of the proof will show that the knives used were pocketknives.

It seems to be perfectly well settled that, both at common law and under statutes which do not specify the instrument, it is unnecessary in an indictment to state the means or instrument made use of by an assailant to effectuate his murderous intent. 1 Wharton Crim. Law., 602, and authorities there cited.

The recital, therefore, of "pocketknives" in the indictment, was unnecessary, and might be rejected as surplusage. It is argued, however, that if the indictment specifies the kind of instrument, it must be proved even to the most minute detail. Many larceny cases are cited by opposing counsel, but these

cases are not in point.  In larceny it is essential to charge that some article was stolen, and the stolen article must be stated in the indictment.  If the stolen article is described with unnecessary particularity, then such description must be proved. But in this offense the nature of the weapon need not be charged.

Precedents are not wanting in support of the doctrine that upon indictment for assault with pocketknives, a similar weapon may be proved.  Thus, it is said, in an Alabama case, "the indictment charges the assault to have been made with a razor.  There was evidence to show that the assault was made with a pocketknife.  The lower court instructed the jury in substance that it was immaterial whether the assault was made with a razor or pocketknife, and refused to charge at the request of the defendant, that if the jury had a reasonable doubt as to the assault being made with a razor, they must acquit the defendant.  It is sufficient if the substance of the charge be proven, without regard to the exact instrument used.  Though the indictment charges a particular weapon, the averment is substantially proved if it be shown that some other instrument was employed, which occasions a wound of the same kind as the instrument charged and the consequences naturally follow." *Hall* v. *State,* 79 Ala., 32.

This statement of law has the highest sanction from Mr. Bishop, who used this language:  "In homicide and other assaults there must be a not easily defined harmony of a general sort between the allegations and proofs of the act, but the same need not be minute.  For example, it has been held that a charge of assault, 'with a weapon, to-wit, a gun,' is not sustained by evidence of an assault with the hand.  But where the instrument proved is of the same nature as that alleged,—as where a homicide is charged to have been committed with a piece of iron, and the evidence was that it was with a piece of plank,—there is no variance."  1 Bishop's Crim. Proc., sec. 488, c.

The law being thus, it is manifest that the state's first instruction, which does not specify the kind of deadly weapon, is not erroneous, since all of the proof shows that the assault was made with knives, and the principle above announced has direct and conclusive application.

In the second place, it is admitted that the record, taken as a whole and fairly considered, sufficiently shows that the knives used were pocketknives. Of course, it is not necessary for the state to show by direct testimony the character of the knives. This may be inferred from the circumstances surrounding the participants, their use of the weapons, the sources from which they were procured, and other circumstances. *Porter* v. *State,* 57 Miss., 300.

Much emphasis is laid by learned counsel for appellants on the fact that these appellants are charged with a joint crime, and it is insisted that the proof does not support the charge. But, in view of the state's testimony that both appellants, at the same time, in full view of each other, were pursuing Harrison with knives, and fell upon him at about the same time, both doing their best to kill him, it is submitted that the proof was ample to warrant the jury in concluding that this was a joint assault.

Considering now the second charge for the state, the only complaint made by the appellants is upon the ground that the charge is in the alternative, and that the first part of the charge should be considered separate and apart from the rest, and that, so considered, appellants are deprived of the right of self-defense; but the conclusive answer to this objection is that both the first and second alternatives are modified equally by that part of the charge which begins with the words, "with the intent to kill and murder him," etc. So considered, the charge is not subject to the criticism offered.

Argued orally by *A. J. McLaurin,* for appellant, and by *R. V. Fletcher,* attorney-general, for appellee.

MAYES, J., delivered the opinion of the court.

There are nineteen assignments of error in this case, but few of them are pressed seriously. We have carefully considered them all, and concur that none of them is well taken, except that our Brother CALHOON maintains that the first instruction for the state is erroneous, and that the modification of the twelfth instruction for the defense is erroneous, and that the second instruction for the state is erroneous. With the exceptions indicated in the dissent of our brother, we all concur that no one of the other assignments of error is well taken.

Concerning the contention that the indictment should charge the specific weapon with which the assault and battery was committed, and that it is not sufficient to charge that it was committed with a deadly weapon, we merely observe, first, that we have examined carefully all the authorities cited by the learned counsel for appellants, and find that they do not sustain the contention; and, second, that any fair reading of this testimony, taken as a whole, shows that the knives used were pocketknives. See 1 Wharton's Criminal Law, p. 602; *Hull* v. *State,* 79 Ala., 32; 1 Bishop on Criminal Procedure, sec. 488; *Porter* v. *State,* 57 Miss., 300.

The case made by the facts in this record is briefly as follows: Sam Harrison had been operated upon for appendicitis and was in an enfeebled condition. A brother of Harrison had killed a brother of the Canterbury boys. So far as this record is concerned, it does not appear that Sam Harrison had any connection with that killing. This difficulty occurred on Sunday at a church meeting. Harrison and Luckey were under a tree, some little distance away, preparing to eat dinner. Abel Canterbury during the morning had been grimacing at Harrison and frowning at him wherever he chanced to see him. Abel and Crosby walked up to where Harrison and Luckey were sitting, and Crosby exchanged greetings with Harrison and Luckey. Harrison did not speak to Abel Canterbury, but Abel Canterbury insisted that he had done so. Harrison kept

insisting that he had not spoken to him, and that he did not want to have any trouble with him. Abel Canterbury pulled off his coat and said he was the best man on the grounds. Old man Canterbury got in between them, and tried to keep them apart; but Abel kept coming closer and closer, and finally he and Harrison got together. Harrison struck Abel Canterbury over old man Canterbury's shoulder, according to the testimony of the defense, and old man Canterbury struck Harrison in the back. Both of these blows, apparently, seem to have been with knives. Abel Canterbury rushed off and snatched a knife from some one on the grounds, and turned and made for Harrison, who, having cut old man Canterbury, undertook to run away. This is the first stage of the difficulty. It is obvious that the difficulty was brought on by Abel Canterbury, and that Harrison was in no manner to blame for its commencement. After Harrison fled, all three of the Canterburys pursued him with knives in their hands, Harrison retaining his knife. Old man Canterbury was so badly wounded that he stopped, the two appellants still pursuing Harrison with drawn knives. They chased him for about fifty yards. At the corner of the schoolhouse Bud Canterbury and Harrison exchanged licks, Bud Canterbury stabbing him in the shoulder, and Harrison cutting his collar. Harrison kept up his flight around the house, and finally stumbled and fell to the ground, and both the appellants fell on him. They both got on him and stabbed him many times, or, as one witness expresses it, "for all they were worth." In this condition, Harrison lying on the ground and both the appellants sitting on him, stabbing him, Abel Canterbury's sister got hold of his arm, trying to stop the trouble. He jerked himself free of her, when a Mr. Curry came up and with a stick which he had in his hand prevented Abel Canterbury from further stabbing, by interposing his stick between the blow and the body. Whereupon Abel Canterbury threatened him by saying that if he did not stop interfering with him he would cut him, and it was only upon the

arrival of several other men, who took charge of Abel Canterbury, that he could be pulled off the prostrate man. Bud Canterbury, also, had to be taken off by force by several parties. This is this case, as plainly made out by the testimony for the state in this record. It is further to be observed that the district attorney, with commendable fairness, put on the stand nearly all the eyewitnesses who saw the whole transaction. The witnesses for the defense are composed partly of relatives of the appellants, but mostly of those who did not see the entire difficulty, but mainly what took place at the wagon between John Canterbury (the old gentleman), Abel Canterbury, and Harrison. The motive impelling Abel Canterbury seems to have been the difficulty between Harrison's brother and his brother.

On this case it is impossible to doubt that the defendants intended to kill and murder. The contention that these two appellants did not intend to kill and murder Harrison, when the testimony shows that they chased him for fifty yards with drawn knives, falling upon him when he had fallen to the ground in a helpless condition; stabbing him with their knives, and stopping only after the most strenuous effort; threatening those who sought to draw them off—but were acting in self-defense and had the right to pursue a man fleeing for his life in order to save their own lives, is one, to put it mildly, that utterly fails to commend itself to our minds. Was it necessary to the preservation of the lives of these two appellants, or to save them from any great bodily harm, that they should chase a man in full flight for fifty yards, and then pounce upon him while he was down and helpless? It is impossible for us to conceive how any serious contention can be made that these two appellants could, in any imaginable way, have been in danger from Harrison, while he was in full flight, of death or great bodily harm. On this state of the case the court gave instruction number one for the state, set out in the dissenting opinion, which we think states the case precisely as it ought to have

been stated, announcing the law applicable to the facts with absolute correctness. The testimony abundantly shows that Harrison had abandoned the difficulty and was fleeing for his life, and was then pursued by the appellants, fallen upon, and stabbed whilst he was on the ground, when neither of the defendants could have been in the slightest danger of death or great bodily harm at his hands.

The twelfth instruction for the defendant is as follows: "The jury are instructed, for the defendants, as a matter of law, that if they believed, and had reasonable cause to believe, that Sam Harrison had sought them out for the purpose of killing them, or of doing them great bodily harm, and that Sam Harrison was prepared therefor with deadly weapons, and that Sam Harrison made demonstrations manifesting an intention to commence an attack, then the defendants or defendant so threatened were not required to retreat; but they had the right, under the law, to stand and defend themselves, and to pursue and if in so doing it was necessary, or upon reasonable grounds Sam Harrison until they had secured themselves from danger, it appeared to be necessary, to commit an assault and battery with intent to kill Sam Harrison, their acts are excusable upon the grounds of self-defense, and if the jury so believe from the evidence they must find the defendants not guilty." This instruction was modified by the court, but not read to the jury. The first observation to be made about this instruction, which was given with the simple modification of striking out the words "and to pursue Sam Harrison," is that, as asked, it was manifestly erroneous on the case made. There was not a scintilla of evidence in the case to show that "Sam Harrison had sought them out for the purpose of killing them, or of doing them great bodily harm," or that Sam Harrison "made demonstrations manifesting an intention to commence an attack. Abel Canterbury began the difficulty beyond any controversy, Harrison seeking to avoid trouble, and the instruction as given was manifestly erroneous, for the reason that there was no evidence to

sustain it.   Being erroneous as asked, for the reason that there was no testimony to support the instruction, the modification did not cure the error, and the instruction as modified should have been refused by the court.   This being the case, no error could be predicated on this instruction, because the court modified it and the defendant did not use it, because the instruction was wrong as asked and as modified, and the failure to use an erroneous instruction can never constitute reversible error. We repeat that no evidence can be found in the record to support this charge, and that the only error the court committed was against the state in granting to the defendant, even as modified, an instruction wholly unwarranted by the testimony.   The only demonstration Harrison made after the trouble at the wagon was to flee for his life, and if at that time the appellants had stopped, as they ought to have done, being themselves in no manner of danger, there might have been something in their contention that what they did up to that time was done in the heat of passion.

Our dissenting brother earnestly contends that it was the duty of the court to give a charge to the jury that they might find a verdict less than a verdict of assault and battery with intent to kill and murder, and that there was evidence tending to show that what was done was all done in the heat of passion. We cannot agree with him in this view of the case made by the evidence.   As stated, these appellants chased this man fifty yards, fell upon him, and stabbed him when he was down and helpless.   It seems to us to be utterly unreasonable to contend that this was in the mere heat of passion, and the jury have so found.   As to the insistence that it is the duty of the court to give a charge to the jury that they might find a less verdict than a verdict of assault and battery with intent to kill and murder, the conclusive answer is that in this state the law has absolutely taken from the judge the right to give any charge to the jury in any state of case, unless that charge is requested by the parties to the litigation in writing.   The circuit judge is

helpless in the matter. The citation from p. 212, vol. 11, Ency. of Pleading and Practice, is good law in those states in which judges are permitted to charge the jury what the law is, as in the English practice and the federal practice; but it has no application in this state under our peculiar statute about instructions.. The law in our state on this subject is set down in terms too plain to be misunderstood. . In the case of *Archer* v. *Sinclair,* 49 Miss., 343, SIMRALL, J., delivering the opinion of the court, said: "The parties have a right to indicate, by written requests, the points upon which they respectfully desire the jury to be informed as to the law. Under our system it would not be proper for the court to instruct *sua sponte*." It seems perfectly clear, from the course the trial took, that the defense fought this case out below on the issue of self-defense, purposely declining to ask instructions suggesting that the defendants might be guilty of something less than that charged; and the state also fought it out on the issue that the appellants were guilty as charged, or not guilty at all. The appellants cannot be permitted to experiment with the courts in this fashion. They will not be allowed intentionally to decline to ask charges presenting to the jury the theory that they might be guilty of an attempt to kill and slay, growing out of the heat of passion, and not of an attempt to kill and murder, seeking to obtain a clear acquittal on the ground of self-defense in the court below, and then for the first time in this court complain that the court did not of its own motion give a charge about a lesser offense, which charge they themselves studiously avoided asking. Nothing in the world was easier than for the appellants to have asked such a charge. They did not do it, and the court was by the law prohibited from giving any instructions for the defense except those which they asked in writing. The court cannot be blamed, therefore, for the absence of such a charge in this record, since the appellants, who alone could have asked it, declined to do so.

The only error we deem it necessary to advert to is the as-

signment that the second charge is erroneous, because it told the jury in the alternative that, if they believe beyond a reasonable doubt that appellants made an assault simply, they might nevertheless be convicted of assault and battery, the indictment charging assault and battery. Viewed as a mere abstract proposition, it undoubtedly is an incorrect statement of the law to say that, where an indictment charges an assault and battery, the jury may convict of assault and battery, although they only believe from the evidence the defendant to be guilty of an assault. But the indictment here charges assault and battery both. The evidence overwhelmingly shows both assault and battery to have been committed by both these appellants, and the error amounts to nothing—could have had no possible influence on the verdict. Nobody contends, except the two appellants themselves, that they did not stab Harrison on the ground after chasing him. It is true both appellants swear positively that neither saw the other stab Harrison while lying on the ground. It is further true—a most astonishing statement—that each swears that he did not see the other on Harrison.

On the whole case, it seems to us, after the most patient consideration, that the learned circuit judge charged the law with great accuracy, except in charging far too favorably for the defense in the twelfth instruction; that the district attorney acted with great fairness in putting on the stand all eyewitnesses who saw the whole difficulty; that the verdict is right, and that no other result could possibly be reached on any reasonable view on another trial; and that the judgment should be, and hereby is AFFIRMED.

CALHOON, J., delivered the following dissenting opinion:

In this case there was testimony tending to show self-defense, and much stronger evidence to show that the actions of the accused were in the heat of passion, naturally engendered, without malice aforethought, which would, if Harrison had been

killed, have reduced the homicide to manslaughter.   There was no instruction for either the state or defense defining either murder or manslaughter.

The court gave only two instructions at the instance of the state.   They are as follows:   Number One: "The court instructs the jury, for the state, that even though they should believe from the testimony that Sam Harrison was the aggressor, yet if they further believe from the evidence beyond a reasonable doubt that Harrison abandoned the difficulty and began a flight, and if they further believe from the evidence beyond a reasonable doubt that Harrison was pursued by Abel Canterbury and Bud Canterbury, and attacked by them with deadly weapons with intent to kill and murder said Harrison at the time when they, defendants, were in no immediate danger, real or apparent, of loss of life or great bodily harm, they should find the defendants guilty as charged in the indictment." Number Two: "The court charges the jury, for the state, that if from the evidence they believe beyond a reasonable doubt that defendants, Abel Canterbury and Bud Canterbury, made an assault on Sam Harrison with deadly weapons, or if they made an assault and cut and wounded the said Sam Harrison with deadly weapons, to-wit, pocketknives, with the intent to kill and murder him, the said Sam Harrison, as charged in the indictment, at a time when they, the defendants, were in no immediate danger, real or apparent, of loss of life or of great bodily harm, then the jury should return a verdict of guilty as charged in the indictment."

The following instruction was given for the defense, but only as modified by the court, as will appear:   Number Twelve: "The jury are instructed, for the defendants, as a matter of law, that if they believed, and had reasonable cause to believe, that Sam Harrison had sought them out for the purpose of killing them, or of doing them great bodily harm, and that Sam Harrison was prepared therefor with deadly weapons, and that Sam Harrison made demonstrations manifesting an intention to

commence an attack, then the defendants or defendant so threatened were not required to retreat; but they had the right under the law to stand and defend themselves, and to pursue Sam Harrison until they had secured themselves from danger, and if, in so doing, it was necessary, or upon reasonable grounds it appeared to be necessary, to commit an assault and battery with intent to kill Sam Harrison, their acts are excusable upon the grounds of self-defense, and if the jury so believe from the evidence they must find the defendants not guilty." This was modified by the court, and not read to the jury. The modification is that the court erased the words, "and to pursue Sam Harrison."

It will be observed that instruction Number One for the state fully presents the theory of the prosecution that even if Harrison was the aggressor, still if he abandoned the difficulty, and "was pursued" by the accused with intent to kill and murder him, they should be convicted. Granting that this was correct on this line of thought, it is quite notable that the accused were refused the correlative proposition that they had the right to pursue him if they believed, from his demonstrations, that it was necessary to their security. This refusal to them and agreement to the counter request of the state plainly emasculated the defense of its constitutional right to an impartial trial, and affects seriously the status of all citizens, however innocent, who may be indicted. The right to pursue, when apparently necessary to self-defense, is too thoroughly settled for any sort of disputation, and the right to have the jury so instructed is plain, where there is, as here, testimony in support of it.

In Ency. Pl. & Pr., vol. 11, p. 212, we find this in the text: "If there is evidence tending to reduce the grade of the offense, it is the duty of the court to give in charge the law applicable to that grade of offense, and it makes no difference that the evidence tending to reduce the grade of the offense is very slight, or that the only evidence tending to reduce the offense

is the testimony of the defendant himself." See, also, *Id.*, 215. So far as I know authorities *contra* cannot be found in the books, English or American. The proposition is vital for the protection of the innocent, as all are primarily presumed to be. The jury, not the court, determine the probative force of what the witnesses testify. The same volume of the same book, on page 215, says: "An instruction correct in point of law and applicable to the evidence should always be given, no matter how slight the evidence in support of the hypothesis on which the evidence is based. The instruction, if pertinent, should be given, without regard to the weight or preponderance of the evidence." Mississippi has announced this rule and applied it in civil and criminal cases: *Levy* v. *Gray,* 56 Miss., 318; *Hursey* v. *Hassam,* 45 Miss., 134; *Nichols* v. *State,* 46 Miss., 284; *Rivara* v. *Ins. Co.,* 62 Miss., 720. It is wholly immaterial what view the court may take of the facts. They are for the sole determination of the jury, and it is of vital importance to the citizen that a jury of his countrymen shall pass on the truth of such facts as are favorable to him, even though he alone testifies to them. No court has ever yet, since the incumbency of JEFFREYS, been so autocratic as to deny this salutary rule. The only instances where judicial tribunals have taken charge of testimony and evidence and erroneous instructions occur where the testimony of the defendant himself makes out a case of guilt as charged.

The first instruction for the state is also fatally defective in excluding any consideration of heat of passion. It tells the jury they "should find the defendants guilty as charged in the indictment"—that is, of assault and battery with intent to kill and murder—if satisfied beyond reasonable doubt Harrison was pursued and "attacked" by the accused "with deadly weapons with intent to kill and murder" him, etc. "Kill and murder" is strictly a legal phrase, and yet murder is not defined and differentiated from manslaughter in this or any other instruction on either side. Juries are not supposed to be lawyers, or

to discriminate between murder and manslaughter. If Harrison had been killed, it is my opinion that the verdict, under proper instruction, would have been for manslaughter at most.

The second instruction for the state is flagrantly erroneous, not only because it has the vice of the first, just noticed, but directs conviction of assault and battery with intent to kill and murder, even though defendants were guilty only of an assault with deadly weapons. It cannot be true in Mississippi that one may be convicted of a battery when he committed an assault only. An assault is an attempt to commit a battery. It is included in a battery; but a battery is not included in an assault. The clauses of Code 1906, § 1043, make separate offenses. *Morman* v. *State,* 24 Miss., 54. And, as one may be convicted of only what he did, instructions should be specific. An assault with intent, etc., is not an assault and battery with intent, etc. *Montgomery* v. *State,* 85 Miss., 330, 37 South., 835; 1 Wh. Crim. Laws, sec. 640. At no time in any case is a defendant called upon to ask any instruction modifying guilt, or in exculpation. He is at arm's length. But at all times, in all cases, the state must charge the law, if at all, on that on which it must stand or fall, unless the defense asks some instruction neutralizing any error. In announcing a different rule, or making it incumbent on the defense, under any circumstances, to ask a charge about anything, or under any phase of the case, I submit that there is manifest error in the majority opinion. Defendants need not correct the state's errors.

The majority opinion is quite full and accurate in stating the case made in the testimony for the state, but is curiously silent as to that delivered on the part of the defense. It does state that: "Nobody contends, except the two appellants themselves, that they did not stab Harrison on the ground after chasing him. It is true both the appellants swear positively that neither saw the other stab Harrison while lying on the ground. It is further true—a most astonishing statement—that each swears that he did not see the other on Harrison." From my

standpoint the statement of the defendants themselves is ample
ground for the propositions laid down in this dissenting
opinion.   There is absolute conflict between the impressions
of the majority and my own impressions about the facts in
this case.   From my understanding, upon a fair review of
the evidence, the facts are that Abel Canterbury and Harrison
had a misunderstanding; Abel saying that Harrison had spoken
to him and Harrison denying it.   At this juncture Abel took
his coat off, manifestly for a fist fight, and also, manifestly,
when Abel was entirely unarmed.   Thereupon Harrison started
towards Abel, when old man John Canterbury, the father, got
between them in order to prevent conflict.   At this time, and
for the first time in this whole controversy, Harrison attempted
to rush on Abel with a knife drawn in his hand, and reached
over old man John Canterbury's shoulder, stabbed Abel in the
arm, and then attempted to cut old man Canterbury's throat,
and did make such a tremendous and long gash from near the
temple down into the throat that the bystanders thought the
old man was killed, and the outcry was from the crowd that
"Sam Harrison has cut old man Canterbury's head off."   It
is thus baldly manifest that Sam Harrison was the aggressor
with a deadly weapon, and that, if he had then slain either old
man Canterbury or his son Abel, it would have been a glaring
case of murder.

It will be noted here that the indictment is a joint indict-
ment against old man Canterbury and both of his sons, Abel
Canterbury and Bud Canterbury.   The district attorney, of
course, very properly caused a verdict of not guilty to be en-
tered in favor of John Canterbury, the old man.   It is also
absolutely certain that Bud Canterbury was not present at that
time.   It appears from the testimony for the defense, and I
think cannot be successfully disputed, that Bud Canterbury,
hearing the outcry that his father had been killed, started to go
to him, when he met Sam Harrison, who endeavored to kill him
and cut his clothing as he passed him, and thereupon Bud Can-

terbury started in pursuit, and, without concert, he and Abel were equally in pursuit.  It is also true by the testimony of the defense that, while Sam Harrison was running off, it may be running to make his escape under the impression, which he might well have had, that he had killed old man Canterbury, he had his hand as if on a pistol threatening his pursuers, which, if true, warranted the pursuit.  It is also certain that Sam Harrison stumbled and fell, and that his two pursuers fell on him; but both swear that they did not cut while he was down.  Bud had struck him a blow with a knife after Harrison had struck him.  While it may be perfectly obvious, as the majority opinion indicates, that it is too plain that the difficulty was brought on by Abel Canterbury, this can only be true on the basis that Abel was taking his coat off for a fist fight, which at no period of the quarrel warranted Harrison in assaulting him and his father with a deadly weapon.  Besides this, the postulate of the majority opinion is not sustained that old man Canterbury pursued Harrison with a knife.  The only mine from which this can be drawn is the testimony for the state, which I regard as overthrown, and certainly it is overthrown by the verdict of not guilty as to the old man.  It is true that Bud Canterbury, who was never at the scene where his father was cut nearly to death, did stab Harrison as he met him; Harrison first cutting at him.

But all this matter of testimony *pro* and *con* can only properly be considered in determining the propriety of the action of the court in charging the law.  It is true that, where the defense itself makes out a case of guilt, errors in instructions need not be noticed.  It is also true that where there are instructions on both sides, and there is technical error in an instruction given for the state, the court will not notice the error, where, taken as a whole, it plainly appears that the jury could not have been misled; but these are not this case, and I stand on the proposition that wherever Anglo-Saxons live, a defendant has the right, even upon his own testimony alone, to have

an instruction given based upon his testimony, so that the jury may finally determine the facts. I also stand on the proposition that it is improper, and a reversible error, for any court, particularly in a case like that before us, to charge the jury that if they believe only an assault was made with intent to kill and murder, without defining what murder means, they should convict of assault and battery with intent to kill and murder. When we depart from these basic principles, the rights of men are tossed about by the caprices of courts, and we are at large on an anchorless ocean, with no haven landlocked by the everlasting principles of law. On one announcement of the majority opinion I am reminded and my attention is called to the fact that the twelfth instruction asked by the defendant and modified by the court was not used before the jury. I say further on this point that there was ample testimony that Sam Harrison did seek out Abel Canterbury to kill him, and did in fact try to kill him, and did in fact also try to kill old man Canterbury. True it is that Abel Canterbury made the first warlike demonstration, in that he commenced to pull his coat off, which was no more than an invitation to a fisticuff fight. But it is plain that thereupon Harrison did advance on him to kill him, and, while his father had backed him up against a wagon, Harrison rushed in, reached over the father's shoulder, stabbed Abel, and then cut the old man's throat. Under this state of facts it is idle to discuss the question that Abel Canterbury could possibly have been guilty of no more than manslaughter, at the most, if he had run after and killed Harrison. There was no cooling time under any view of the law or of human action.

I deny utterly that there is any distinction whatever in the granting or refusal of instructions between our system of asking written instructions and the English system of oral charges. It is true that neither side need ask an instruction; but, whenever one is asked, it must be a proper instruction, and, if not proper, it must be refused or modified to cover the case. This

principle is repeatedly announced in adjudications of our own court from the date of its territorial government up to this time; and let it be noted that the principle is derived from the common law, and is as old as the common law itself, and has never been deviated from in any case in my knowledge, except that now in hand. The majority opinion agrees with my view that, as an abstract proposition, it is not proper to convict of an assault and battery where only an assault is charged and proved; but the majority opinion says that the indictment charges both assault and battery here, and the evidence overwhelmingly shows both assault and battery to have been committed, and that therefore the error amounts to nothing. I say that it is for the jury to determine whether or not there was an assault and battery by the two Canterburys, and that it is exceedingly dangerous for courts to be assuming the prerogative of the jury. I have an abiding faith that there was error, and, whether these men be guilty or innocent, it is equally important for the courts to so declare. Courts sentence. The jury only can convict a freeman, and then only on the law properly charged, if charged at all.